Ronald Eugene **RICKMAN**

v.

Michael **DUTTON**, Warden, Riverbend Maximum Security Institution.

No. 3:85–0256.

United States District Court,
M.D. Tennessee,
Nashville Division.

Sept. 2, 1994.

Henry A. Martin, William P. Redick, Paul R. Bottei, Nashville, TN, for petitioner.

Glenn R. Pruden, C. Mark Fowler, Nashville, TN, for respondent.

## MEMORANDUM

JOHN T. NIXON, Chief Judge.

In this habeas corpus proceeding under 28 U.S.C. § 2254, Petitioner Ronald Eugene Rickman challenges the constitutionality of his 1978 conviction and death sentence imposed by the Criminal Court of Shelby County, Tennessee. Commencing May 3, 1994, the Court conducted a limited evidentiary hearing on Rickman's claims challenging only the constitutionality of his conviction for first-degree murder. Upon the evidence presented and argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law, in accordance with Fed. R.Civ.P. 52(a).

## I. FINDINGS OF FACT

### A. *Procedural History*

1. In June, 1977, William Edward Groseclose hired Petitioner Ronald Eugene Rickman and Phillip Michael Britt to murder his wife, Deborah Lee Groseclose. On July 4, 1977, Mrs. Groseclose was found murdered in the trunk of her automobile. After a trial in

the Criminal Court of Shelby County, Tennessee, in February, 1978, Rickman was convicted of first-degree murder for his role in the death of Mrs. Groseclose.[1] Rickman was sentenced to death at the conclusion of a sentencing hearing held between March 1 and March 3, 1978.

2. The Tennessee Supreme Court affirmed Rickman's conviction and sentence on February 17, 1981. *State v. Groseclose & Rickman,* 615 S.W.2d 142, 150 (Tenn.1981). The Tennessee Supreme Court affirmed Groseclose's conviction and sentence in the same proceeding. *Id.* On February 27, 1981, the Tennessee Supreme Court denied a petition for rehearing. *Id.* at 142. On October 5, 1981, the United States Supreme Court denied Rickman and Groseclose's respective petitions for a writ of certiorari. *Groseclose v. Tennessee,* 454 U.S. 882, 102 S.Ct. 366, 70 L.Ed.2d 193 (1981); *Rickman v. Tennessee,* 454 U.S. 882, 102 S.Ct. 367, 70 L.Ed.2d 193 (1981).

3. Rickman and Groseclose filed petitions for post-conviction relief in the Criminal Court of Shelby County, Tennessee. The trial court conducted an evidentiary hearing on March 25–26, 1982, and denied their petitions on December 5, 1982. On February 16, 1984, the Court of Criminal Appeals affirmed the trial court's judgment. Rickman and Groseclose then each filed petitions for rehearing. The Court of Criminal Appeals denied Groseclose's petition on March 2, 1984, and denied Rickman's petition on March 12, 1984. On July 2, 1984, the Tennessee Supreme Court denied Rickman and Groseclose's applications for permission to appeal. On October 29, 1984, the United States Supreme Court denied Rickman's petition for a writ of certiorari. *Rickman v. Tennessee,* 469 U.S. 963, 105 S.Ct. 363, 83 L.Ed.2d 299 (1984). The United States Supreme Court denied Groseclose's petition for a writ of certiorari on November 26, 1984. *Groseclose v. Tennessee,* 469 U.S. 1066, 105 S.Ct. 549, 83 L.Ed.2d 436 (1984).

4. Rickman filed the instant petition for writ of habeas corpus under 28 U.S.C. § 2254

on March 5, 1985, challenging the legality of his confinement and death sentence. (Pet. Habeas Corpus, Doc. No. 5.) By Order entered on March 5, 1985, this Court granted a stay of execution of Rickman's death sentence. (Ord., Doc. No. 8.) The State filed its answer on September 27, 1985. (Answer, Doc. No. 31.) On May 25, 1989, the Court transferred this action to the Western District of Tennessee. (Ord., Doc. No. 48) After ordering the file returned by Order entered on November 21, 1989 (Doc. No. 56), the Court vacated its order to transfer this action.

5. On June 28, 1989, Rickman filed a second petition for post-conviction relief in the Criminal Court of Shelby County, Tennessee. The trial court dismissed Rickman's second petition for post-conviction relief on February 20, 1990. The Court of Criminal Appeals affirmed the trial court's decision on September 11, 1991. On October 4, 1991, the Court of Criminal Appeals denied Rickman's petition for rehearing, filed September 23, 1991. On February 24, 1992, the Tennessee Supreme Court denied Rickman's application for permission to appeal, filed October 30, 1991.

6. On July 23, 1990, Rickman filed a motion to amend his petition for writ of habeas corpus. (Mot. Am. Pet. Habeas Corpus, Doc. No. 66.) The Court granted the motion on September 14, 1992. (Am. Pet., Doc. No. 89A.) The State filed an answer to the amended petition on September 24, 1992. (Am. Answer, Doc. No. 90.) On November 5, 1992, this action was referred to the Magistrate Judge for case management.

7. Rickman filed a second motion to amend his petition for writ of habeas corpus on November 23, 1992. (Mot. Am. Pet. Habeas Corpus, Doc. No. 106.) On February 26, 1993, the State filed an answer to Rickman's second amended petition. (Second Am. Answer, Doc. No. 121.) The Court granted Rickman's second motion to amend petition on March 5, 1993. (Second Am. Pet., Doc. No. 128A.) On May 20, 1993, the State filed a motion for writ of mandamus in the

---

**1.** Rickman's co-defendants, William Edward Groseclose and Phillip Michael Britt, were also tried and convicted of first-degree murder. Gro-

seclose was sentenced to death, and Britt was sentenced to life imprisonment.

United States Court of Appeals for the Sixth Circuit, which the Sixth Circuit granted on November 9, 1993.

8. Pursuant to a scheduling order entered on January 4, 1994 (Doc. No. 169), Rickman filed an amendment to his petition for writ of habeas corpus on January 20, 1994. (Third. Am. Pet., Doc. No. 174.) On January 31, 1994, the State filed an answer to Rickman's third amended petition for writ of habeas corpus. (Third Am. Answer, Doc. No. 185.)

9. On March 10, 1994, Rickman filed a motion for partial summary judgment. (Pet'r Mot. Partial Summ.J., Doc. No. 211.) The State filed a response to Rickman's motion for summary judgment and a cross-motion for partial summary judgment on March 23, 1994. (Resp't Resp. Mot. Partial Summ. J., Doc. No. 224.) On April 1, 1994, Rickman filed a reply to the State's response to Petitioner's motion for summary judgment (Doc. No. 236), and a motion to strike the State's cross-motion for summary judgment (Doc. No. 235).

10. On April 11, 1994, the Court heard oral argument from the parties on Rickman's motion for partial summary judgment. By Memorandum and Order entered on April 24, 1994 (Doc. Nos. 270, 271), the Court granted Rickman's motion for summary judgment on the claim that his death sentence was unconstitutional because the jury had considered and weighed a vague "heinousness" aggravating circumstance in rendering Rickman's sentence. By Order entered on April 25, 1994, the Court certified its April 24, 1994 decision as appealable under Fed.R.Civ.P. 54(b) and reserved its ruling with respect to all other sentencing issues. (Ord., Doc. No. 272.)

11. Rickman now challenges the constitutionality of his conviction for first-degree murder on the basis of the following claims:

(1) Rickman was denied the effective assistance of counsel at the guilt phase of trial because counsel presented no defense to the charges against Rickman, in violation of the Sixth, Eighth, and Fourteenth Amendments;

(2) Rickman was denied due process and a fair trial because: (a) the prosecution presented the false and misleading testimony of Barton Wayne Mount concerning the nature of Mount's relationship with the prosecution and his agreements and expectations concerning favorable treatment; and (b) the prosecution withheld material evidence concerning the false and misleading nature of Mount's testimony, in violation of the Sixth, Eighth, and Fourteenth Amendments;

(3) The jury rendered an unconstitutional verdict because the jury was provided with a constitutionally infirm instruction on "reasonable doubt" in violation of the Sixth, Eighth, and Fourteenth Amendments;

(4) Rickman's confession was extracted in violation of *Miranda* and his Fifth and Sixth Amendment rights to counsel and right to remain silent;

(5) The prosecution improperly introduced a grenade detonator at trial which was unduly inflammatory, which was not properly admitted into evidence, and which permitted the jury to base a determination of guilt upon extraneous evidence for which Rickman was not on trial, in violation of the Sixth, Eighth, and Fourteenth Amendments;

(6) Rickman was unconstitutionally administered medication which affected his demeanor and ability to assist with his defense, in violation of the Sixth, Eighth, and Fourteenth Amendments;

(7) Rickman was denied his right to a fair jury trial and due process because the jury viewed him in handcuffs and shackles, in violation of the Sixth, Eighth, and Fourteenth Amendments;

(8) Rickman was denied his rights to confrontation, cross examination, and assistance of counsel because, during the jury selection process, the jury was contaminated by the outside influence of statements and comments by prospective jurors who had already been questioned and dismissed from service, in violation of the Sixth, Eighth, and Fourteenth Amendments;

(9) Rickman was denied the effective assistance of counsel for any alleged failure to properly raise any of the issues alleged in his habeas corpus petition at an earlier point in the proceedings, in violation of the Sixth, Eighth, and Fourteenth Amendments;

(10) Rickman was denied due process at the guilt phase of his trial due to the cumulative effect of the errors alleged, in violation of the Eighth and Fourteenth Amendments.

(Second Am. Pet., Doc. No. 128A, at 14–32, 35–37, 44–45, 50–54, 58–60, 66–67; Third Am. Pet., Doc. No. 174, at 1–2; Pretrial Ord., at 3–6.)

12. On May 3, 5, and 10, 1994, the Court conducted a limited evidentiary hearing on Rickman's claims challenging the constitutionality of his conviction for first-degree murder.

### B. *Facts Relevant To Claims* [2]

#### (1)

1. Rickman's trial counsel, Robert I. Livingston, testified that after being assigned Rickman's case, he interviewed Rickman and asked him if a statement he had given to the authorities was "true." (1 E.H. Tr. 29–30.) When Rickman responded that the statement was true, Livingston assumed that there was no defense and conducted no further investigation. (*Id.* at 29–31.) Livingston spent a total of sixteen hours preparing for Rickman's trial. (Pet'r E.H. Ex. 33.) Livingston's preparation consisted solely of interviews he conducted with Rickman. (*Id.*)

2. Livingston devoted his efforts to getting the State to agree to allow Rickman to enter a plea of guilty and accept a life sentence. (*Id.* at 30.) Livingston acknowledged that he only presented a defense at the sentencing phase of trial. (1 E.H. Tr. 54.) Livingston called no witnesses and made no argument to the jury at the guilt phase.

3. Livingston's defense strategy at the guilt phase was simply to persuade the jury that his client was "abnormal and should not be judged as a normal person," (1 E.H. Tr. 50; Pet'r E.H. Ex. 34), and "to show the jury that we had a sick boy on trial, a subnormal, abnormal human being on trial. . . . That was my [sic] whole object of the whole defense, was try to convince the jury that we had a sick man on trial." (P.C. Tr. 102.) At trial, Livingston elicited testimony from numerous witnesses that Rickman looked dangerous and wild-eyed, that he did not look like a normal, average all-American boy, and that he had planned the crime "to the nth degree." (Trial Tr. 329, 846, 849–50, 942–44, 960, 987–88, 1042–44, 1074–75.)

4. The jury found Rickman guilty of wilful, premeditated, and deliberate murder.

5. At the federal evidentiary hearing commencing May 3, 1994, Dr. Gillian Blair described Rickman's social history and the results of psychological testing and interviews she conducted with Rickman. (2 E.H. Tr. 80–94.) Dr. Blair testified that Rickman is a tenuous and fragmented social misfit, with low self-esteem and deep-seated feelings of inferiority. (*Id.* at 51–74.) Dr. Blair stated her opinion that Rickman was sane at the time of the crime. (*Id.* at 139.) However, she concluded as well that Rickman's psychological profile is not that of a cold-blooded killer. (*Id.* at 159–60.) Dr. Blair stated that Rickman needed to impress those around him as a "tough guy" by making plans about which he was actually ambivalent to carry out. (*Id.* at 158–60.)

---

2. Citations to the record are made as follows:

| | |
|---|---|
| Voir dire Tr. \_\_\_ | (State Trial Voir Dire Transcript, Page) |
| Trial Tr. \_\_\_ | (State Trial Transcript, Page) |
| Closing Arg. Tr. \_\_\_ | (State Trial Closing Argument, Page) |
| Tech. Rec. \_\_\_ | (State Trial Technical Record, Page) |
| P.C. Tr. \_\_\_ | (State Post–Conviction Transcript, Page) |
| \_\_\_ P.C. Ex. \_\_\_ | (State Post–Conviction Exhibit, Page) |
| Doc. No. \_\_\_ | (Federal Court Document Docket Number) |
| \_\_\_ E.H. Tr. \_\_\_ | (Volume, Federal Evidentiary Hearing Transcript, Page) |
| \_\_\_ E.H. Ex. \_\_\_ | (Party, Federal Evidentiary Hearing Exhibit, Number) |

(2)

6. On September 13, 1977, Mount, Groseclose, Britt, and Rickman were indicted for first-degree murder by the Shelby County Grand Jury. Prior to trial, Mount's attorneys, James Galloway and Richard Vaughn, sought to settle Mount's case with the Shelby County District Attorney's Office. (2 E.H. Tr. 181.) Mount's attorneys believed that it would be to Mount's benefit to testify against his co-defendants. (*Id.* at 183.) Vaughn knew that Mount and the other co-defendants were going to be tried jointly, and he wanted to avoid a trial. (*Id.* at 182.) Vaughn believed that it would be a bad case to take to trial, and that Mount would likely be convicted of first-degree murder if he was tried with his co-defendants. (*Id.*)

7. Upon Galloway's request, Shelby County District Attorney General Hugh Stanton met with Galloway and Vaughn to discuss having Mount cooperate with the State and testify against the other co-defendants. (2 E.H. Tr. 21, 181.) During his sixteen-year tenure as District Attorney General, General Stanton tried only three cases, while settling hundreds of others. (*Id.* at 9–10.) When settling cases through plea agreement, General Stanton was aware that defense attorneys approached him seeking settlement in order to promote the best interests of their clients. (*Id.* at 16.) General Stanton believed that Mount was cooperating in order to get the best possible offer from the State. (*Id.* at 26.)

8. Because he agreed to cooperate with the State, Mount was transferred from the Shelby County Jail to the Memphis Correctional Center (MCC) on December 5, 1977. (2 E.H. Tr. 21, 22, 24.) One of the conditions of Mount's incarceration at MCC was that he was permitted to visit with his parents. (Pet'r E.H. Ex. 3.) Although General Stanton did not seek severance of co-defendants if to do so would merely multiply the number of trials on a particular offense, it had also been agreed that Mount's case would be sev-

ered. (Pet'r E.H. Ex. 19 [3]; 2 E.H. Tr. 16–17, 19, 27.)

9. General Stanton first met with Mount at the MCC on December 5, 1977. (2 E.H. Tr. 24.) During that meeting, General Stanton took a statement from Mount, in the presence of Mount's attorneys, in preparation for examining Mount at the trial of his co-defendants. (*Id.* at 24–25.) All of the parties understood that General Stanton was taking Mount's statement to prepare for trial and not to be used against Mount. (*Id.* at 26.) By that time, General Stanton fully intended not to seek the death penalty against Mount. (*Id.* at 27.) Moreover, prior to Rickman's trial, General Stanton decided that he would not seek a first-degree murder conviction against Mount, and would allow him to plead guilty to second degree murder. (*Id.* at 28.)

10. When a co-defendant agreed to testify against his other co-defendants, General Stanton did not normally make an official offer of settlement to the witness prior to the witness testifying. (2 E.H. Tr. 18–19.) The purpose behind withholding a final offer was to prevent the witness from being impeached while testifying due to the existence of the offer. (*Id.*)

11. Mount and his attorneys believed that Mount's cooperation would work to his benefit, and they did not seek immunity for any of Mount's statements or for Mount's trial testimony. (2 E.H. Tr. 184.) Mount's attorneys counseled Mount about the advantages of testifying for the State. (*Id.* at 184–85.) On December 6, 1977, Galloway sent Mount's telephone bill to Assistant Attorney General Jewitt Miller. (Pet'r E.H. Ex. 2.) On December 7, 1977, Galloway contacted the Warden at the MCC to discuss the agreed-upon conditions of Mount's incarceration. (Pet'r E.H. Ex. 3.)

12. On December 9, 1977, Rickman filed a motion seeking disclosure of any agreement or understanding between the State and its witnesses "that could conceivably influence said witnesses' testimony." (Tech. Rec. 43.)

---

**3.** Exhibit 19 contains notes dated October 12, 1978, from the Shelby County District Attorney General's Office about *State v. Levi Williams & Timothy Horton,* Attorney General File No.

E6897. The notes reflect that, upon reviewing the facts in the case, the Attorney General's Office would not sever the codefendants.

The State responded that "the defendant has no right to any such information." (Tech. Rec. 74.)

13. On February 6, 1978, General Stanton met with and took another statement from Mount, fully intending not to use it against him. (Pet'r E.H. Ex. 11; 2 E.H. Tr. 30–32.) Although severance had been agreed upon months earlier, Mount finally filed his motion for severance on February 13, 1978, the day that trial began. (2 E.H. Tr. 190.) Mount's trial was officially severed on February 14, 1978. (Pet'r E.H. Ex. 37.) Mount then testified against the other defendants as a witness for the prosecution. While testifying, Mount stated that he had not received any consideration from the prosecution, and that he did not expect any consideration. (Trial Tr. 266–69.) He professed that there had not been any "deal to deal," and that he could still receive the death penalty. (Id. 268, 269.)

14. After Rickman's conviction, nothing happened in Mount's case for several months. On October 16, 1978, the Shelby County Criminal Court denied Rickman's motion for a new trial. On October 23, 1978, the court set Mount's case for disposition on November 27, 1978. (Pet'r E.H. Ex. 37.) On November 14, 1978, the District Attorney General offered Mount a 10–year sentence in exchange for a guilty plea to second degree murder. (2 E.H. Tr. 33.) On November 27, 1978, Mount entered a plea of guilty to second degree murder. (Id. at 186.)

15. General Stanton continued to reward Mount for his cooperation after Mount was incarcerated. On March 17, 1980, General Stanton wrote a letter to the Warden of MCC in which he recommended that Mount be reclassified to minimum security status, and stated that Mount had been "as cooperative as one could be in the trial of the case...." (Pet'r E.H. Ex. 5.) On August 27, 1980, the MCC Reclassification Review Committee recommended that Mount be reclassified to minimum security status. (Pet'r E.H. Ex. 7.) Mount thanked General Stanton for Stanton's efforts on his behalf by letter dated September 3, 1980. (Pet'r E.H. Ex. 8.)

16. When Mount appeared before the Tennessee Parole Board, Mount's attorney argued that Mount should be paroled because Mount had cooperated with the State from the start, and that Mount's testimony had been vital to the State's case against Rickman. (2 E.H. Tr. 189.) Mount was paroled on May 23, 1982. (Pet'r E.H. Ex. 20, at 4.) On August 23, 1982, Mount was completely released from parole supervision. (Id.)

(3)

17. At the guilt phase of his trial, Rickman's jury was given the following "reasonable doubt" instruction:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

(Trial Tr. 2422.)

(4)

18. On July 12, 1977, Rickman was arrested in Tulsa, Oklahoma. Rickman was interrogated in Tulsa on July 13, 1977, by Tulsa Police Officer Daverne ("D.A.") Roberts, and Memphis Police Officers Kenneth East and William Hylander. At 9:49 AM on that same day, Rickman gave a formal statement to Roberts, East, and Hylander, implicating himself in the death of Deborah Groseclose.

19. At trial, Rickman denied that he waived his *Miranda* rights knowingly and voluntarily, and maintained that he gave the statement only after his repeated requests for counsel were ignored. The trial court conducted a hearing, "resolve[d] the credibility in the favor of the State," and admitted the statement into evidence. (Trial Tr. 1571–73.)

(5)

20. At trial, the State introduced evidence of a grenade detonator that allegedly be-

longed to Rickman. (Trial Tr. 678–79.) Rickman objected to the admission of the grenade detonator evidence, but his objection was overruled by the trial court.

(6)

21. Although neither Rickman nor Groseclose requested any assistance in sleeping, jail officials took them to see Dr. Wender, a psychiatrist, prior to trial. (P.C. Tr. 233.) Dr. Wender informed Rickman and Groseclose that he was going to give them Dalmane, a sedative. (*Id.*) On February 17, 1978, the day before Rickman and Groseclose's joint trial commenced, the State began administering Dalmane to Rickman and Groseclose, each at a dosage of 30 milligrams per day. (*Id.* at 183, 186, 308.) The State began administering the depressant Meprobamate to Groseclose on February 22, a few days into the trial. (*Id.* at 183.) The State began administering Meprobamate to Rickman on the following day. (*Id.* at 186; Pet'r P.C. Ex. 6.) Both Rickman and Groseclose received the maximum allowable dosage of 1600 milligrams per day. (P.C. Tr. 183, 186, 301.) Rickman and Groseclose remained on the same dosages of Dalmane and Meprobamate throughout the trial. On March 7, a few days after the trial ended, the State began reducing the Meprobamate dosage given to both Rickman and Groseclose to 1200 milligrams each per day. (*Id.* at 184, 187; Pet'r P.C. Ex. 6.)

22. At the State post-conviction hearing, Dr. Ramirez, Director of Alcohol and Drug Abuse at the Memphis Mental Health Institute, testified that Meprobamate is an "anti-anxiety" drug. (P.C. Tr. 301–02, 324.) Drowsiness is one of the side effects of Meprobamate. (*Id.* at 302, 303.) An individual who takes the maximum dosage of 1600 milligrams per day generally exhibits slower speech and coordination, and may act as if he were intoxicated. (*Id.* at 334–36.) Meprobamate can cause addiction, as well as physical and psychological dependency. (*Id.* at 304.) Dalmane, which is used to treat insomnia and induce sleep, has similar physical and physiological effects. (*Id.* at 308, 323.) When Dalmane is used in combination with Meprobamate, the two drugs together have a much more powerful effect on the central nervous system than either drug has separately. (*Id.* at 308–09.)

23. Dr. Ramirez confirmed that a person given a combination of Meprobamate and Dalmane would be slower and less responsive to his environment. (P.C. Tr. at 315, 330.) Although Dr. Ramirez testified that both a psychological and a physical examination would be required in every case before either Dalmane or Meprobamate was administered, neither Rickman nor Groseclose received either type of examination. (*Id.* at 311–16.)

24. Groseclose reported that he struggled to remain awake at trial, and Rickman indicated that he did not fully remember the events of the trial due to the medication. (*Id.* 43–44, 234–35.)

(7)

25. During a recess in the testimony of girlfriend, Pamela Baker Lindsey, Rickman was returned to court in handcuffs. (Trial Tr. 798–808.) After Lindsey began testifying for a matter of time which is reflected in ten pages of the trial transcript, *see* Trial Tr. 798–808, Rickman released an "audible groan" which was recorded in the transcript by the court reporter. (*Id.* at 808.) At that point, Rickman's attorney stated, "Judge, my client's sitting over there with handcuffs on." (*Id.*) Judge Lafferty responded that he had not known that Rickman had been handcuffed, and ordered the handcuffs removed. (*Id.* at 809.) The bailiff removed the handcuffs, and Rickman's attorney continued cross-examining Lindsey. (*Id.*)

(8)

26. While several prospective jurors waited in the jury room to be called for *voir dire,* they overheard statements about the case made by individuals who were returning to the jury room after they had been questioned on *voir dire.* Although one prospective juror overheard comments regarding Rickman's guilt or innocence, she stated under oath that the comments she overheard would not affect her verdict and that she could be fair and impartial. (*Voir dire* Tr. 1054–55.) She ultimately did not serve on Rickman's jury. The other prospective jurors who overheard comments reported that the comments they overheard were related only to whether the indi-

viduals speaking "had been over there" for *voir dire* and whether they had been excused from the jury. (*Id.* at 1051–58.)

## II. CONCLUSIONS OF LAW

As a preliminary matter, the factual findings of the State courts are entitled to a presumption of correctness under 28 U.S.C. § 2254(d) unless any one of several statutory exceptions to the general presumption exists [4], or a petitioner establishes by convincing evidence that the State court factual findings are erroneous. *See Sumner v. Mata,* 455 U.S. 591, 597–98, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982). This presumption of correctness only applies, however, to basic, primary, or historical facts, and not to mixed questions of law and fact. *Levine v. Torvik,* 986 F.2d 1506, 1514 (6th Cir.1993), *cert. denied,* 509 U.S. ——, 113 S.Ct. 3001, 125 L.Ed.2d 694 (1993).

### A. *Claim 1: Ineffective Assistance Of Counsel* [5]

■ A criminal defendant has a Sixth Amendment right to receive effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 685–86, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). The standard for establishing "cause" as a result of ineffective assistance of counsel is two-pronged: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged

deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687, 104 S.Ct. at 2064. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Mere attorney ignorance or inadvertence will not constitute "cause" unless the error rises to the level of a constitutional violation. *See Coleman v. Thompson,* 501 U.S. 722, 751–55, 111 S.Ct. 2546, 2566–67, 115 L.Ed.2d 640 (1991). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. ——, ——, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

In assessing counsel's performance, a reviewing court must be highly deferential. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. The court must determine whether under the circumstances counsel's allegedly unreasonable acts or omissions "were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. While strategic choices made after thorough investigation are generally considered within the range of competent assistance, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. at 2066. *See also Martin v.*

---

**4.** The presumption of correctness does not apply if a petitioner demonstrates, or a state admits, the existence of one or more of the following circumstances:

(1) that the merits of the factual dispute were not resolved in the state court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding on which the determination of such factual issues was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record....

28 U.S.C. § 2254(d).

**5.** Although Rickman also asserts that he was denied the effective assistance of counsel at sentencing, the Court only addresses his claim alleging ineffective assistance of counsel at the guilt phase of trial. Rickman has reserved this and other sentencing phase issues for hearing and resolution at some later point, should a determination on any unresolved sentencing phase issues become necessary.

*Rose,* 717 F.2d 295 (6th Cir.1983) (counsel ineffective where failed to interview alibi witnesses and unaware of investigative file prepared by public defender); *United States v. Goodwin,* 531 F.2d 347 (6th Cir.1976) (counsel ineffective where misunderstood elements of offense and examined client at preliminary hearing in such a manner that client inadvertently confessed).

■ Rickman asserts that he was denied the effective assistance of counsel at the guilt phase of trial because his attorney failed to investigate, prepare, or present a defense to the charges against him. Although State court factual findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(d), the Court recognizes that the question of effectiveness of counsel raised in the instant claim is a mixed question of law and fact which is subject to a *de novo* review by this Court. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070.

### 1. *Deficient representation*

The standard for measuring attorney performance is "reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065. Trial counsel was thus bound by a standard of care applicable when this case was tried in 1978 in Shelby County, Tennessee. The Tennessee Supreme Court established the standard applicable at that time in *Baxter v. Rose,* 523 S.W.2d 930 (Tenn.1975). In *Baxter,* the court stated that attorney competence would be measured under the "duties and criteria" set forth in *United States v. DeCoster,* 487 F.2d 1197 (D.C.Cir.1973); the Sixth Circuit standard established in *Beasley v. United States,* 491 F.2d 687, 696 (6th Cir.1974); and the American Bar Association Standards relating to the Administration of Criminal Justice, particularly those portions of the Standards relating to the "Defense Function." *Baxter,* 523 S.W.2d at 936.

The *Baxter* court therefore adopted the Sixth Circuit's requirement that defense counsel perform at least as well as a lawyer with ordinary training and skill in the criminal law; conscientiously protect his client's

interest, undeflected by conflicting considerations; and investigate all apparently substantial defenses available to the defendant and assert them in a proper and timely manner. *See Beasley,* 491 F.2d at 696, *cited in Baxter,* 523 S.W.2d at 935. Moreover, the court adopted the following explanation of counsel's duties from *DeCoster:*

> Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed.... [T]he adversary system requires that "all available defenses are raised" so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

*Baxter,* 523 S.W.2d at 933 (citing *DeCoster,* 487 F.2d at 1204 (citation omitted)).

■ At the evidentiary hearing commencing before the Court on May 3, 1994, Rickman's trial counsel, Robert I. Livingston, testified that after being assigned Rickman's case, he interviewed Rickman and asked him if a statement he had given to the authorities was "true." (1 E.H.Tr. 29–30.) Livingston then stated that, after being told by Rickman that the statement was true, "From that point on, my defense was to persuade the District Attorney of Shelby County to allow Ronald Rickman to enter a plea of guilty and accept the life sentence...." (*Id.* at 30.) Livingston assumed that there was no defense to the charge of first-degree murder and failed to conduct any investigation. (*Id.* at 29–31.)

Livingston acknowledged that he only presented a defense at the sentencing phase of trial. (1 E.H.Tr. 54.) With respect to the guilt phase of trial, he asserted, "There was no defense." (*Id.* at 54.) Accordingly, Livingston did not interview any witnesses [6],

---

**6.** Approximately 40 witnesses testified at trial for the prosecution. (1 E.H. Tr. 38.) Mr. Livingston

did not interview any of the witnesses prior to trial. (*Id.*) Moreover, Mr. Livingston did not

conduct any legal research, or obtain and review any records, including those regarding Rickman's employment, education, mental health, social services contacts, military service, or prison experience. (*Id.* at 23–29, 34–38.) By Livingston's account, he spent a total of sixteen hours preparing for Rickman's trial. (Pet'r E.H.Ex. 33.) Livingston's preparation consisted solely of interviews he conducted with Rickman. (*Id.*)

Livingston testified that a contemporaneous newspaper account of Rickman's trial accurately reported that Livingston's defense strategy was "to persuade the jury that his client, although judged legally competent to stand trial, is, in fact, abnormal and should not be judged as a normal person." (1 E.H. Tr. 50; Pet'r E.H. Ex. 34.) At the hearing on state post-conviction review, Livingston stated that he "was trying to show the jury that we had a sick boy on trial, a subnormal, abnormal human being on trial.... That was my [sic] whole object of the whole defense, was try to convince the jury that we had a sick man on trial." (P.C.Tr. 102.)

In client interview notes Livingston recorded when interviewing Rickman, Livingston noted that Rickman underwent "mental tests when he was 16 years old," and that Rickman should receive a "psychiatric examination to determine his mental competency to stand trial." (Pet'r E.H.Ex. 27, at 1, 3.) However, after Rickman was evaluated as being competent to stand trial, Livingston did not conduct any investigation of Rickman's mental status. (1 E.H.Tr. 45–46.) Livingston's testimony at the evidentiary hearing indicates that he may not have understood the legal difference between a competency determination and an insanity evaluation:

Q. Well, it is true, isn't it, Mr. Livingston, that there are questions concerning mental state that are relevant to the guilt stage of the trial?

A. Well, I can see that, yes, but as I say, I never considered that Ronald Rickman was mentally incompetent for any purpose.

interview any of the co-defendants or any of Rickman's family or social contacts. (*Id.* at 24–

Q. I am not talking about competency; I am talking about defenses at the guilt stage of the trial?

A. Well, I did what I could with what I had to convince the Jury that the man was somewhat less than a normal human being, and as far as me arguing incompetency to the Jury, I didn't, because I didn't think he was mentally incompetent, but I thought he was abnormal and subnormal, and I still do.

Q. Are you under the impression, Mr. Livingston, that incompetency is a defense to a charge of murder?

A. Of course, I do.

(*Id.* at 45–46.)

The Court finds that Livingston failed to investigate, prepare, and present a defense for Rickman. Although Livingston believed that Rickman was "abnormal" and knew that Rickman had received a psychiatric assessment at one time, Livingston failed to investigate or even recognize the mental defenses potentially available to Rickman. The Court concludes that such failures by trial counsel "fell below an objective standard of reasonableness," *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064, and establish that counsel was deficient under the first prong of the *Strickland* test.

### 2. *Prejudice*

In order to prevail on his ineffective assistance of counsel claim, Rickman must demonstrate as well that counsel's deficiencies prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

The prosecution's theory and proof was that William Groseclose, through intermediary Barton Wayne Mount, conspired with Rickman and Phillip Britt to kill Mrs. Groseclose. At trial, Mount testified for the State, and statements that Rickman and Britt gave to the authorities were introduced into evidence. (Trial Tr. 200–468, 1583–1601, 2067–2090.) Rickman argues that the proof is consistent with the proposition that he did

29, 34–38.)

not intend to kill Mrs. Groseclose, but rather intended only to incapacitate her while he took credit for completing the contract and collected his money from Groseclose.

Rickman points out that his statement reflects that he did not have a lethal weapon when he entered the victim's residence. (Trial Tr. 1583–1601.) As well, Rickman argues that the statement supports his theory that he did not intend to kill the victim after sexually assaulting her. (*Id.* at 1590.) Rickman allowed her to shower and dress, inflicted a non-lethal battery on her with a pocket knife, and then left her, aware that she was alive, in the trunk of a car in a public library parking lot, where she died of systemic hyperthermia. (*Id.* at 1590–1591.) Rickman therefore argues that there is a reasonable likelihood that he would have been convicted of a lesser degree of homicide, but not first-degree murder, if the jury had been presented with the theory that he did not have the intent to kill Mrs. Groseclose.

In addition, Rickman asserts that he was prejudiced by Livingston's failure to investigate mental health defenses or to introduce the testimony of a mental health expert. In support of his claim, Rickman introduced the testimony of a clinical psychologist, Dr. Gillian Blair, at the evidentiary hearing. Dr. Blair has conducted several tests and interviews with Rickman and has reviewed Rickman's social history.[7] (2 E.H.Tr. 46–175.) Rickman argues that Dr. Blair's testimony supports the proposition that Rickman did not willfully premeditate and deliberate to kill Mrs. Groseclose.

Dr. Blair testified that Rickman suffered a devastating childhood that has resulted in his development as a tenuous and fragmented social misfit, with low self-esteem and deep-seated feelings of inferiority. (2 E.H.Tr. 51–74.) Although Dr. Blair believes that Rickman was sane at the time of the crime, she has concluded as well that Rickman's psychological profile is not that of a cold-blooded

killer. (*Id.* at 139, 159.) Dr. Blair stated that Rickman needed to impress those around him as a "tough guy" by making plans about which he was actually ambivalent to carry out. (*Id.* at 158–60.) Dr. Blair stated, however, that at the time of the crime Rickman understood the wrongfulness of his actions and could conform his behavior to the requirements of the law. (*Id.* at 80.)

Although it is quite possible that Rickman's defense would have benefitted from some investigation and research by Livingston, the Court is unable to determine how exactly the lack of such investigation and research resulted in prejudice. In addition, the Court finds no prejudice resulting from Livingston's failure to have a psychological expert testify during the guilt phase of trial because an expert such as Dr. Blair would have testified that Rickman was sane and that he *could* have premeditated a murder. The Court concludes that Rickman has failed to demonstrate that counsel's deficiencies, as significant as they were, resulted in actual prejudice.

■ The Court recognizes, however, that there are certain situations in which it is unnecessary to demonstrate "prejudice" in order to prove ineffective assistance of counsel. *See United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984). For example, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* Where counsel thus "fail[s] to function in any meaningful sense as the Government's adversary," *id.* at 666, 104 S.Ct. at 2051, prejudice is presumed. *Id.* at 659, 104 S.Ct. at 2047.

■ Functionally, a defendant may be totally denied counsel even though his attorney is physically present during the proceedings. *Lombard v. Lynaugh*, 868 F.2d 1475, 1480

---

7. Dr. Blair reported that she administered a full psychological battery of tests on Rickman; conducted twelve to fifteen hours of interviews with Rickman; talked with Rickman's adoptive mother and one of his sisters; and reviewed school records, medical records, psychological records, South Carolina Department of Child Welfare records, naval records, adoption reports, prison records, interviews with family members, transcripts and evidence in Rickman's capital case, and the extensive social history of Rickman and his extended family prepared by Pat Feigley, MSW. (2 E.H. Tr. 46–52, 107.)

(5th Cir.1989) (citing *Cronic* for proposition that constructive denial of counsel is also presumptively prejudicial). Counsel is required to remain an "active advocate," *Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985), and observe a duty of "zealous and loyal representation," *Nix v. Whiteside,* 475 U.S. 157, 188, 106 S.Ct. 988, 1005, 89 L.Ed.2d 123 (1986). *See also United States v. Swanson,* 943 F.2d 1070, 1075 (9th Cir.1991) (defense counsel's actions in assisting the prosecutor constituted abandonment of counsel's duty of loyalty to client and created conflict of interest). Notably, "attorneys who adopt the role of the judge or jury to determine the facts pose a danger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment." *Nix,* 475 U.S. at 189, 106 S.Ct. at 1005 (citation omitted).

In a case with facts similar to the instant action, the Court of Appeals for the Tenth Circuit held defense counsel to be ineffective in a capital case where counsel was unprepared and antagonistic toward his client. *Osborn v. Shillinger,* 861 F.2d 612 (10th Cir. 1988). The strategy of Osborn's counsel, like that of Livingston, was simply to persuade the prosecutor not to seek the death penalty for his client. *Id.* at 626. When the prosecutor continued to pursue the death penalty, Osborn's attorney was wholly unprepared, and his failure to investigate had not been based on a reasonable determination that further investigation was unnecessary. *Id.* at 626–27.

The Tenth Circuit thus recognized that "an attorney who adopts and acts upon a belief that his client should be convicted 'fails to function in any meaningful sense as the Government's adversary.'" *Osborn,* 861 F.2d at 625 (citing *Cronic,* 466 U.S. at 666, 104 S.Ct. at 2051). The *Osborn* court specifically criticized counsel for making statements to the press about his client which "could easily have come from the prosecutor, rather than defendant's counsel," *id.* at 628, and warned that "an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants because the inter-

ests of the state and the defendant are necessarily in opposition." *Id.* at 629.

In the instant action, there is overwhelming evidence that Livingston was sympathetic to the prosecution and effectively abandoned representation of Rickman at trial. For example, in cross-examining prosecution witness and co-conspirator Barton Wayne Mount, Livingston suggested to Mount that Mount had carefully planned out the crime with Rickman and the other co-defendants "to the nth degree," listing the name of each co-defendant separately for greater emphasis. (Trial Tr. 329.) Livingston reinforced the notion of planning despite proof which suggested that the defendants entered the victim's residence without a lethal weapon and may have lacked a coherent plan at that point as to how she was to be killed.

Livingston repeatedly elicited testimony which portrayed Rickman in a deviant, destructive, and threatening light. Livingston asked Mount if he did not consider the defendants to be "nuts," if he thought them to be "normal," chided Mount because Mount "never suspected that there was anything wrong with either one of them," and concluded, "You wouldn't know a psychiatric case if you saw one, would you?" (Trial Tr. 292.) In examining Pamela Baker Lindsey, with whom Rickman had been living at the time of the victim's death, Livingston referred to Rickman's apparent nickname, "Bull," by asking her if Rickman "act[ed] like a bull ... I mean, violent...." (*Id.* at 846.) Lindsey responded, "When he was mad, yes." (*Id.*)

For no apparent reason, Livingston referred several times to a hand grenade detonator and a motorcycle jacket that allegedly belonged to Rickman. Moreover, while making such references, Livingston demonstrated contempt for his own client. Livingston thus engaged in the following exchange with Lindsey:

Q. Did Ron ever tell you he was going to blow somebody up with it? [referring to the grenade detonator]

A. He was always threatening to bomb the 7–Eleven stores ... but I didn't believe him.

Q. What other crimes did he tell you he was going to commit that you didn't believe?

A. Is that really important?

Q. Yes, ma'am.

A. He was always talking about catching some buildings on fire if he was mad at somebody. . . . One time he threatened to kill a person over me.

(Trial Tr. 849–50.) Livingston asked Ralph Vance, the son of Rickman's apartment manager, "Do you think average red-blooded American boys wear something like this [motorcycle jacket]?" (*Id.* at 942–43.) Referring to the hand grenade detonator, Livingston asked Vance, "Do you think a normal red-blooded American boy would walk around with a live grenade? What do you think about that?" (*Id.* at 944.) Vance answered, "Well, it's not all the grenade. It's a detonator there. . . ." (*Id.*)

When Livingston examined Ron Casper, a member of the United States Marine Corps who lived in Rickman's apartment building, Livingston asked, "You also thought that Ron Rickman was a gentleman, didn't you?" When Casper responded, "Yes, sir, I am under that impression," Livingston commented, "[Nineteen] years in the Marines and you would think that a man that looked like that was a gentleman?" (Trial Tr. 960.) Then, at a later point in Casper's examination, Livingston engaged in the following exchange:

Q. . . . When you saw him walking around out there looking like a Buddhist monk,[8] did you call this girl [Pamela Baker Lindsey]'s brother and say: Look, your little sister's getting ready to run off with a fellow that looks like a Buddhist monk.

A. No sir, I did not.

Q. . . . Now, you think, a fellow that looks like a Buddhist monk is a normal, average, red-blooded American boy?

A. Depends on what he wants to do.

(Trial Tr. 987–88.)

Livingston's antagonism toward his client was perhaps best illustrated when he cross-examined Anthony Scola and Royce Wolfe. Scola and Wolfe were called by the State to testify that they had observed Rickman and Britt in what appeared to be the victim's car. Livingston cross-examined Scola about Rickman as follows:

Q. Did he appear to be intoxicated?

A. I don't think so.

Q. Did he appear to be under the influence of any type of narcotic drug?

A. I really don't know.

Q. What about his eyes? Did he kind of have a wild, glassy look in his eyes?

A. I didn't look at his eyes.

Q. You just looked at that grin on his face.

A. Well, he just turned his head and smiled. I didn't think anything of it. . . .

Q. Normal looking fellow, wasn't he?

A. I guess so.

Q. . . . Yeah. You wouldn't call somebody that looked like this a normal, average, American looking boy, would you? [demonstrating Rickman's mug shot]

A. In this day and time, yes.

Q. . . . Thank God, I'm abnormal.

(Trial Tr. 1042–44.) After taking Wolfe through the same line of questioning as Scola, Livingston asked Wolfe:

Q. You haven't been out on the street today then, have you? Woods is full of them, didn't you know that? Guys that look like this. Long hair. Long beard. Wild eyed. You know they're out there, don't you? I know they're out there.

A. Right.

Q. Grinning. Like they just got out of somebody's insane asylum. You know what I'm talking about, don't you?

A. I know what you're talking about.

(Trial Tr. 1074–75.) Rickman's own attorney thus presented a terrifying image of Rick-

---

8. At the evidentiary hearing before this Court, Mr. Livingston testified sarcastically that upon first seeing Rickman, "I thought the man was a Buddhist monk." (1 E.H. Tr. 17.) Rickman's head was shaved at that time.

man to the jury through his questioning of the witnesses.

Livingston's disregard for his client is evidenced as well by his failure to conduct any investigation into possible defenses or interview any witnesses or principals other than Rickman himself prior to trial. Livingston believed there was no defense available at the guilt stage. Accordingly, Livingston did not attempt to present any defense except to show that Rickman was "abnormal" or "subnormal," neither of which constitutes a legal defense or justification. Finally, when the Shelby County Sheriff's Office began administering Meprobamate and Dalmane to Rickman, Livingston did not seek medical advice about the effect of the drugs or ask Rickman about the effect of the drugs on him. (1 E.H. Tr. 84–85.) According to Livingston, it was his impression that the drugs simply "calmed him down" and "[i]f the doctor prescribed . . . the medication, I had no opinion one way or the other." (2 P.C. Tr. 144; 1 E.H.Tr. 85.)

The Court finds that Livingston was hostile to his client and so burdened by a conflict of interest that he failed to subject the prosecution's case to meaningful adversarial testing as required under the Sixth Amendment.[9] *See Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047; *Osborn,* 861 F.2d at 625. Under the unusual circumstances present in this action, prejudice is therefore presumed. *Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047. The Court concludes that Rickman received constitutionally ineffective assistance of counsel at the guilt phase of trial.

**B.** *Claim 2: False Testimony of Barton Wayne Mount*

■ Rickman alleges that the State improperly presented Barton Wayne Mount's false and misleading testimony and withheld evidence concerning Mount's credibility and the truth of his statements.

It is fundamental that a State may not use false testimony to obtain a conviction against a criminal defendant. *See Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935). The same prohibition exists when "the State, although not soliciting false testimony, allows it to go uncorrected when it appears." *Giglio,* 405 U.S. at 153, 92 S.Ct. at 766 (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). *See also Bragan v. Morgan,* 791 F.Supp. 704, 713 (M.D.Tenn.1992) (relief available where witness, "although not technically committing perjury, left the jury with a materially false impression"). Moreover, if the State suppresses evidence favorable to an accused, due process is violated "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).

■ When a witness testifies against a co-defendant, evidence of any understanding or agreement is relevant to such witness' credibility and a jury is entitled to consider it. *See Campbell v. Reed,* 594 F.2d 4, 7 (4th Cir.1979); *Brown v. Wainwright,* 785 F.2d 1457, 1465 (11th Cir.1986) (jury entitled to

---

9. Although Mr. Livingston's representation at sentencing is not before the Court, Mr. Livingston's remarks to the jury at sentencing are illustrative of the hostility the Court finds Mr. Livingston must have manifested toward Rickman throughout the trial. For example, Mr. Livingston stated:

> . . . . I know this young woman was put in the trunk of that car. That's no secret. I know that. And I'm not happy about it. No, sir. I'm not happy. I'm ashamed. I'm ashamed that we live in such a world. . . . I'm ashamed that this crime has been committed in our community. And I want the family of Debra [sic] Groseclose to know that. That I'm ashamed. I'm ashamed that this young woman died in this oven. Mr. Miller, I'm ashamed.

I'm ashamed, Mr. Stanton. I don't condone murder. I know criminal defense lawyers suffer from what is called guilt by association. When I go to church Sunday, they are going to waylay me out at the Bellevue Baptist Church. . . .

(Closing Arg. Tr. 52.) Mr. Livingston then commented further:

> . . . [T]hat wild man [Rickman] over there with the gloves on—look at him. He's wild as a March hare, right now. He may take off after me in a minute. I don't know. He's crazy. I know he's crazy. Because if he's normal I can only say, thank you, God, I'm abnormal, an [sic] you are abnormal. . . .

(*Id.* at 68.)

consider "realities of what might induce a witness to testify falsely"). Because "[i]t is a constitution we deal with, not semantics," *Brown,* 785 F.2d at 1465, it makes no practical difference "whether the understanding is consummated by a wink, a nod and a handshake, or by a signed and notarized formal document ceremoniously impressed with a wax seal. A deal is a deal." *Duggan v. State,* 778 S.W.2d 465, 468 (Tex.Crim.App. 1989). Moreover, a co-defendant who testifies with only a reasonable expectation or understanding of leniency, but not a formal agreement, has an even more powerful incentive to testify falsely in order to facilitate a conviction and curry favor with a prosecutor. *Campbell,* 594 F.2d at 7–8 (for purposes of assessing credibility, absence of a formal agreement only increases significance of witness' expectation of favorable treatment).

### 1. *Giglio violation*

■ On the basis of the evidence presented, the Court finds that Mount testified falsely when he stated that he had received no benefit and expected to get no benefit from his testimony. General Stanton testified that, prior to Rickman's trial, he had agreed to sever Mount and take into consideration Mount's cooperation at a later point. Mount had been counseled by his attorneys that it would be to his benefit to testify for the State. In that expectation, Mount had not requested immunity for two statements he gave to the District Attorney's Office or for his testimony at trial. Indeed, the State had agreed not to use Mount's incriminating statements against him, and intended to treat Mount with leniency. The State's deal with Mount was finally consummated when Mount's cooperation was no longer needed, after Rickman was convicted and his motion for a new trial had been denied.

Accordingly, the Court finds that the State allowed Mount to testify falsely when Mount testified that he had not received or expected any consideration for his testimony; that he had not "made a deal to deal" with the District Attorney; that he faced electrocution as a possible punishment; and that the State would use his testimony against him if the State chose to do so. Instead, the State and Mount had an understanding, implicit or explicit, that Mount would receive leniency and consideration, and in fact Mount received such consideration both before and after trial. The State and Mount had an understanding that Mount's statement would not be used against him, and that Mount would not face the death penalty. The State was under an affirmative duty to correct Mount's false and misleading testimony, and the State failed to do so.

■ Where a conviction is obtained by the knowing use of perjured testimony, it is fundamentally unfair and must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). The writ must issue unless the failure to disclose perjured testimony is harmless beyond a reasonable doubt. *United States v. Bagley,* 473 U.S. 667, 679–80, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481 (1985).

Mount's testimony was critical to the State's case against Rickman. Mount provided the only eyewitness account of the planning that occurred among the co-defendants. Mount's testimony thus went directly to the issues of premeditation and deliberation, elements the jury was required to find for first-degree murder. Moreover, the State relied heavily on Mount's eyewitness testimony in its closing argument. (Closing Arg. Tr. 6–9, 11–12.) If the jury had known that Mount was testifying in order to receive consideration from the State and save himself from a death sentence, and that there was an implicit understanding of immunity for Mount's testimony, there is a reasonable likelihood that the jury would not have relied upon Mount's testimony in finding the requisite *mens rea* for first-degree murder. Because the State has not demonstrated that the perjurious testimony was harmless beyond a reasonable doubt, the Court grants the writ.

### 2. *Brady violation*

■ The file of the Shelby County District Attorney General contains several documents about which neither Rickman nor any

attorney representing him had knowledge until the file was made available in 1992. Specifically, the file includes documents which reflect that prior to trial: (1) Mount's attorney Richard Vaughn requested discovery from the State by letter dated November 22, 1977 (Pet'r E.H. Ex. 1); (2) Mount was interviewed by District Attorney General Hugh Stanton on December 5, 1977, in the presence of his attorneys (Pet'r E.H. Ex. 10); (3) Mount's attorney James Galloway forwarded Mount's telephone bill to Assistant District Attorney Jewitt Miller by letter dated December 5, 1977 (Pet'r E.H. Ex. 2); (4) Galloway wrote to the Warden of the MCC on December 7, 1977, "to advise [the Warden] that as a condition of his incarceration ... Barton Wayne Mount and I agree that he is not to have any visitors except [his lawyers] and his parents," and to instruct the Warden that they were "agreeable" to Mount having his mail and phone calls censored (Pet'r E.H. Ex. 3) [10]; and (5) Mount, Galloway, Stanton, and Miller met again on February 6, 1978 (Pet'r E.H. Ex. 11).

The State never informed Livingston that any of these documents existed, and never described the substance of the information contained in the documents or the content of the meetings between the District Attorney General's Office and Mount and his attorneys. Moreover, Livingston was never provided Mount's records from the Tennessee Department of Correction. (1 E.H. Tr. 90; Pet'r E.H. Ex. 20.) Despite the fact that Rickman's post-conviction counsel requested all District Attorney General records relating to Rickman's case, the District Attorney General's Office continued to withhold Rickman's file until compelled to do so in 1992 by the ruling in *Capital Case Resource Center v. Woodall*, No. 01–A–01–9104–CH–00150, 1992 WL 12217, 1992 Tenn.App. LEXIS 94 (Tenn. App. Jan. 29, 1992), in which it was determined that files held by District Attorneys General were "public records" under the Tennessee Public Records Act.

The Court finds that the State failed to provide material evidence with which Rickman could have effectively cross-examined and impeached Mount, and which demonstrates that Mount testified falsely at trial. The Court concludes that there is a reasonable probability that the outcome of the trial would have been different if the State had provided the material to Rickman's counsel and Rickman's counsel had then used it to impeach Mount. *See Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

Furthermore, although Rickman has never presented his claims concerning Mount's testimony to the State courts, the Court rejects the State's assertion that the claims are procedurally defaulted. Recognizing that "[f]ederal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights," *Engle v. Isaac*, 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982), this Court will nevertheless defer only to legitimate state procedural defaults, and not to procedural defaults which do not promote a legitimate state interest. *See Henry v. Mississippi*, 379 U.S. 443, 447–48, 85 S.Ct. 564, 567, 13 L.Ed.2d 408 (1965).

The Court finds that the State of Tennessee simply has no legitimate interest in presenting false testimony and withholding relevant evidence to convict Rickman or any other defendant. If this Court enforced the procedural default under such circumstances, the Court would thereby reward the State for engaging in deceptive activities which enable the State to circumvent the Constitution.

Even if the State arguably has a legitimate basis for enforcing the procedural default, the Court may consider Rickman's claim if he establishes "cause" for the procedural default and "prejudice" attributable thereto. *See Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 2644, 91 L.Ed.2d 397 (1986);

**10.** The Court instructs the State that the Court admits Petitioner's exhibit 3 as relevant to show that Mount's attorneys were in contact with the prosecution, and overrules the State's hearsay objection on the grounds that exhibit 3 has not been offered to prove the truth of the matters asserted in the document. For the same reasons, the Court overrules the State's objections to the admission of a letter from Mount to Assistant Attorney General Miller marked as Petitioner's exhibit 8, and to the objections to the admission of Petitioner's exhibit 22.

*Wainwright v. Sykes,* 433 U.S. 72, 87–91, 97 S.Ct. 2497, 2506–08, 53 L.Ed.2d 594 (1977). Rickman has thus established "cause" by showing that the factual or legal basis for the claim was not reasonably available to counsel or that some interference by officials made compliance impracticable. *See Murray,* 477 U.S. at 488, 106 S.Ct. at 2645. *See also Fairchild v. Lockhart,* 979 F.2d 636, 640 (8th Cir.1992) ("cause" for failure to raise claim where State assured counsel that State had provided entire file and where claim based on material later discovered in file which State had inadvertently failed to disclose), *cert. denied,* —— U.S. ——, 113 S.Ct. 3051, 125 L.Ed.2d 735 (1993); *Bliss v. Lockhart,* 891 F.2d 1335, 1341 (8th Cir.1989) (State's presentation of misleading evidence by witness at trial may constitute "cause"); *Julius v. Jones,* 875 F.2d 1520, 1525 (11th Cir.1989) ("cause" where prosecutor failed to produce *Brady* material and failure unknown to defendant), *cert. denied,* 493 U.S. 900, 110 S.Ct. 258, 107 L.Ed.2d 207 (1989). The State's failure to disclose information placed Rickman at an actual and substantial disadvantage, thereby denying him a fair trial. Rickman has demonstrated that the guilt phase of his trial was infected with constitutional error, and has established "cause" and "prejudice" for any alleged procedural default.[11]

### C. *Claim 3: Unconstitutional "Reasonable Doubt" Instruction*

Rickman alleges that he was denied his rights under the Sixth, Eighth, and Fourteenth Amendments because the jury was charged with an unconstitutional "reasonable doubt" instruction at the guilt phase of trial. The State argues that this Court may not consider Rickman's claim because Rickman failed to raise it in any of his state court proceedings and it is now procedurally defaulted.

#### 1. *Procedural default*

■ On Rickman's direct appeal, the Tennessee Supreme Court affirmed Rick-

man's conviction after reviewing the entire record for error. The Tennessee Supreme Court explained the scope of its review as follows:

> After careful consideration of the assignments of error made on behalf of appellants and of the entire record, we are of the opinion that the verdict and sentence are sustained by the evidence and that no reversible error was committed at the very lengthy trial out of which these appeals arise.

*Groseclose,* 615 S.W.2d at 144. Accordingly, the Tennessee Supreme Court addressed Rickman's "reasonable doubt" claim, as well as all other claims arising from the record, on the merits, and there is no procedural default. *See Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991) (bar to federal review is removed where last state court presented with federal claim reaches merits). In addition, because the Tennessee Supreme Court is under the obligation to consider "fundamental error" in jury instructions, any alleged bar to consideration of this claim would not be "independent" of federal law. *See, e.g., State v. Reece,* 637 S.W.2d 858, 861 (Tenn.1982); *State v. Thompson,* 519 S.W.2d 789, 792 (Tenn.1975). *See also State v. Ogle,* 666 S.W.2d 58, 60 (Tenn.1984) (Tennessee Supreme Court also reviews claims of plain error).

■ The Court recognizes as well that a procedural default presupposes the existence of a firmly established state procedural rule which is applicable to Rickman's claim and with which Rickman has not complied. *See Warner v. United States,* 975 F.2d 1207, 1213 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1314, 122 L.Ed.2d 702 (1993). It is evident that there was no firmly established state procedural rule requiring Rickman to object to the constitutionality of the jury instruction at trial. *See Capri Adult Cinema v. State,* 537 S.W.2d 896, 900 (Tenn.1976) ("constitutional issues may be raised for first time on appeal"). Similarly, on direct appeal Rickman was not required by Tenn.Code

---

**11.** Accordingly, the Court overrules the State's objections, raised at the evidentiary hearing, to the admission of Petitioner's exhibits 1 through 22, as well as to the admission of Petitioner's exhibit 37. Because Rickman's claim is not procedurally defaulted, such exhibits are relevant to assess the claim on its merits.

Ann. § 40–3409 to allege issues as error under any specific instances, as the Tennessee Supreme Court was "bound ... to consider any errors in the record, whether there has been an assignment [of error] or not." *James v. State*, 215 Tenn. 221, 385 S.W.2d 86, 90 (1964) (Tennessee Supreme Court reviews entire record on direct appeal under Tenn. Code Ann. § 40–3409), *cert. denied*, 381 U.S. 941, 85 S.Ct. 1777, 14 L.Ed.2d 705 (1965), *cited with approval in Adams v. State*, 547 S.W.2d 553, 557 (Tenn.1977).[12] *See also Miller v. State*, 584 S.W.2d 758, 760–61 (Tenn. 1979) (quoting *James–Adams* mandate). Rickman thereby received review of his claim on direct review and did not commit procedural default.

 In the event that Rickman did not receive review of his claim in state court proceedings, however, the Court finds that Rickman has established "cause" for his procedural default because there were no attorneys raising such a claim in Tennessee courts and there were no reported decisions indicating that such a claim had been litigated in Tennessee courts at the time of Rickman's trial, appeal, or post-conviction proceedings.[13] *See McBee v. Grant*, 763 F.2d 811, 817, 817 n. 5 (6th Cir.1985) ("cause" exists where legal issue not fully resolved at the time of the alleged default). Because Rickman was prejudiced as a result, his claim is not procedurally defaulted. *See Murray*, 477 U.S. at 485, 106 S.Ct. at 2644; *Wainwright*, 433 U.S. at 87–91, 97 S.Ct. at 2506–08.

2. *Merits*

 The Constitution requires the government to "prove beyond a reasonable doubt every element of a charged offense." *Victor v. Nebraska*, 511 U.S. ——, ——, 114 S.Ct. 1239, 1242, 127 L.Ed.2d 583 (1994) (cit-

ing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). However, no particular form of words is constitutionally mandated when advising the jury of the government's burden of proof. *Victor*, 511 U.S. at ——, 114 S.Ct. at 1243. Instead, "taken as a whole,· the instructions must correctly convey the concept of reasonable doubt to the jury." *Id.* (citation omitted). To evaluate the constitutionality of a jury instruction, "the proper inquiry is not whether the instruction could have been applied in [sic] unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." *Id.* (citation omitted) (emphasis in original).

In the instant case, Rickman alleges that his constitutional rights were violated by the following jury instruction:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

(Trial Tr. 2422.) Rickman argues that this "reasonable doubt" instruction is similar to the "reasonable doubt" instruction held to be unconstitutional in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1991).

In *Cage*, the jury was provided with the following "reasonable doubt" instruction:

> If you entertain a reasonable doubt as to any fact or element necessary to constitute

---

12. Even several years after Rickman's trial, the Tennessee Supreme Court recognized that where a defendant has been sentenced to death "this court is under the duty to 'automatically' review the sentence, which imposes the burden on this court to consider any alleged error, whether called to the trial court's attention or not." *State v. Duncan*, 698 S.W.2d 63, 67–68 (Tenn.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986).

13. Any failure by Rickman to raise his claim may also be excused because failure to reach the merits of the claim could result in a "fundamentally unjust incarceration." *Murray*, 477 U.S. at 495, 106 S.Ct. at 2649 (citing *Engle*, 456 U.S. at 135, 102 S.Ct. at 1576). As the Supreme Court has recognized, an improper "reasonable doubt" instruction is a structural error which necessarily renders a conviction fundamentally unfair. *See Sullivan v. Louisiana*, 508 U.S. ——, —— ——, 113 S.Ct. 2078, 2082–83, 124 L.Ed.2d 182 (1993).

the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*

*Cage,* 498 U.S. at 40, 111 S.Ct. at 329 (emphasis in original). The Supreme Court held that the instruction in *Cage* allowed a reasonable juror to find guilt based on a degree of proof below that required by the Constitution. *Id.* at 41, 111 S.Ct. at 330. In particular, the Court took exception to language in the instruction which equated "reasonable doubt" with "grave uncertainty" and an "actual substantial doubt," and which stated that what was required was a "moral certainty," rather than an "evidentiary certainty," that the defendant was guilty. *Id.* at 40–41, 111 S.Ct. at 329–30.

■ The Supreme Court has recently held that the term "moral certainty" does not, of itself, render a "reasonable doubt" instruction unconstitutional. *See Victor,* 511 U.S. at —— – ——, 114 S.Ct. at 1247–48. For example, reference to the phrase "moral certainty" is constitutionally permissible where the rest of the instruction "lends content to the phrase," *id.* at ——, 114 S.Ct. at 1247, and indicates the government's proper burden of proof. *Id.* In *Victor,* the Court thus upheld the constitutionality of a "rea-

sonable doubt" instruction that included the statement:

> It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, *to a moral certainty,* of the truth of the charge.

*Victor,* 511 U.S. at ——, 114 S.Ct. at 1244 (emphasis in original).[14] The Court expressly found that the "abiding conviction" language, when used in conjunction with the reference to "moral certainty," properly stated the government's burden of proof. *Id.* at ——, 114 S.Ct. at 1247. However, the Court recognized that an instruction which requires only that jurors be "morally certain" of a defendant's guilt impermissibly suggests "a standard of proof lower than due process requires or . . . conviction on factors other than the government's proof." *Id.* at ——, 114 S.Ct. at 1248.

The Court finds that unlike the instruction in *Victor, see Victor,* 511 U.S. at ——, 114 S.Ct. at 1247, the entire "reasonable doubt" instruction in this case does not lend content to the phrase, "[M]oral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense." (Trial Tr. 2422.) Moreover, the instruction contains yet another ambiguous phrase in that "reasonable doubt" is defined as "an inability after such investigation [of all the proof in the case] to let the mind rest easily upon the certainty of guilt." (*Id.*) The Court finds that the "moral certainty" language in conjunction with the "mind rest easily" language suggests to a reasonable juror a lower burden of proof than what is constitutionally required.

■ The jury-instruction error in this case is not subject to harmless error review. *Sullivan,* 508 U.S. at ——, 113 S.Ct. at 2082. Furthermore, relief on this claim is not barred under the rule of *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103

14. The entire instruction provided: "Reasonable doubt is defined as follows: It is *not a mere possible doubt;* because everything relating to human affairs, and *depending on moral evidence,* is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, *to a moral certainty,* of the truth of the charge." *Victor,* 511 U.S. at ——, 114 S.Ct. at 1244 (emphasis in original).

L.Ed.2d 334 (1989), that habeas relief is unavailable where the petitioner is requesting a "new rule" of constitutional criminal procedure, because the application of a general principle of law to a different factual situation does not create a "new rule" of law. *See, e.g., Stringer v. Black*, 503 U.S. ——, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). A "new rule" is created only when the legal principle applied in the case was not dictated by precedent existing at the time the defendant's conviction became final. *Penry v. Lynaugh*, 492 U.S. 302, 314, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989).

Rickman is not seeking a "new rule" of law, but merely application of the principle announced in *Winship*, 397 U.S. 358, 90 S.Ct. 1068, that the jury only convict him with proof beyond a reasonable doubt that he was guilty. Although Tennessee courts were apparently not addressing challenges based on this principle at the time of Rickman's trial, the principle was well-settled at the time of his trial and through the duration of his State proceedings. Relief is not barred on the basis of non-retroactivity because it would have been unreasonable for any judge to deny Rickman's claim if the claim had been reasonably available to Rickman to raise at an earlier point. *See Stringer*, 503 U.S. at ——, 112 S.Ct. at 1140 (federal relief available if state courts' interpretation of existing precedent objectively unreasonable).

### D. *Claim 4: Involuntary Confession*

Rickman raises Fifth and Sixth Amendment challenges to the admissibility of a statement he gave to police shortly after being arrested for Mrs. Groseclose's murder.

#### 1. *Procedural default*

■ It is undisputed that at trial Rickman presented his claim that the statement was extracted in violation of the Fifth Amendment. Although Rickman did not raise the Fifth Amendment claim again on direct appeal, the Court is unaware of any State rule requiring Rickman to do so. Moreover, the Tennessee Supreme Court has

recognized that it is obligated to review any errors in the record, whether there has been an assignment of error or not. *See Adams*, 547 S.W.2d at 557. Accordingly, the Court finds that Rickman's claim was properly presented to the State courts and is not procedurally defaulted for failure to comply with a firmly established state procedural rule. *See Warner*, 975 F.2d at 1213.

By contrast, the Court finds that Rickman's Sixth Amendment claim has not been properly presented to the State courts, and the State statute of limitations has run on his right to file a subsequent petition for post-conviction relief. *See* Tenn.Code Ann. § 40–30–102. Absent a showing of "cause" and "prejudice," Rickman's Sixth Amendment claim is procedurally defaulted for failure to present his claim within the statutory time permitted under Tennessee law. *See Teague*, 489 U.S. at 297–98, 109 S.Ct. at 1068; *Wainwright*, 433 U.S. at 87–91, 97 S.Ct. at 2506–08. Although Rickman received constitutionally ineffective assistance of counsel at trial, Rickman has not demonstrated that he also received constitutionally ineffective assistance of counsel on appeal, where Rickman could have raised his Sixth Amendment claim for the first time.[15] Rickman's Sixth Amendment claim is therefore procedurally defaulted.

#### 2. *Merits of Fifth Amendment claim*

■ Outside of the presence of the jury, the trial court held a hearing to determine the admissibility of Rickman's statement. (Trial Tr. 1494–1507, 1508–73.) Rickman asserted that he had not freely and voluntarily waived his *Miranda* rights, and that he had given his statement to the police only after they had repeatedly ignored his requests for counsel. (*Id.* at 1556–57.) Police officials testifying for the State denied Rickman's version of events, and asserted that Rickman voluntarily and willingly provided the statement and never requested an attorney. (*Id.* at 1494–1507, 1508–21, 1522–53.) The trial court resolved the credibility issue in favor of the State, found that Rickman had been ad-

---

**15.** In reaching this conclusion, the Court finds it significant that Rickman was represented by a

different attorney on appeal.

vised of his rights and had given his statement freely and voluntarily, and admitted Rickman's statement into evidence. (*Id.* at 1571–73.)

Rickman now argues that the State court factfindings are not entitled to a presumption of correctness under 28 U.S.C. § 2254(d) because until 1992 the State withheld documents from Rickman which support his version of the events surrounding the statement he gave to police. Specifically, Rickman argues that the interview notes maintained by the three police officials who took Rickman's statement contain several material discrepancies. Rickman focuses on the fact that one interviewer's notes reflect that Rickman initially denied having knowledge of Mrs. Groseclose's murder. As well, Rickman points out that one interviewer inaccurately testified that Rickman met with Pamela Baker Lindsey immediately before giving his statement, during the nineteen minutes between 9:30 AM, when the interview began, and 9:49 AM, when Rickman started giving his statement.

The Court finds Rickman's argument to be without merit. At the hearing before the trial court, Rickman denied that he had been threatened or intimidated in any way before giving his statement. (Trial Tr. 1557.) Even if Rickman initially denied knowledge of the murder and nineteen minutes elapsed before Rickman began giving his statement to the police, the Court finds such information immaterial to the central dispute regarding the alleged requests for counsel Rickman made prior to giving his statement. The Court presumes the State court factual findings on this claim are correct under 28 U.S.C. § 2254(d), and concludes on the basis of those findings that Rickman voluntarily waived his Fifth Amendment rights. Rickman's statement was properly admitted at trial.

### E.. Claim 5: Admission of Grenade Detonator

 Evidence of a grenade detonator that allegedly belonged to Rickman was admitted at trial over Rickman's objection. The Tennessee Supreme Court held on direct appeal, however, that Rickman's initial objection "must be deemed waived by failure to renew the objection at an appropriate time." *Groseclose,* 615 S.W.2d at 147. Because this is a capital case, however, Rickman was under no duty to object to the introduction of evidence at trial. *See Duncan,* 698 S.W.2d at 67–68. The Court finds, therefore, that Rickman violated no firmly established state procedural rule which would bar consideration of this claim. *See Warner,* 975 F.2d at 1213 (citing *Ford v. Georgia,* 498 U.S. 411, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991)). Moreover, the trial court was on notice that Rickman objected to the admission of the grenade detonator evidence, and any requirement that Rickman object more than once would constitute "an arid ritual of meaningless form." *Osborne v. Ohio,* 495 U.S. 103, 124–25, 110 S.Ct. 1691, 1704, 109 L.Ed.2d 98 (1990) (citing *James v. Kentucky,* 466 U.S. 341, 349, 104 S.Ct. 1830, 1835, 80 L.Ed.2d 346 (1984)).

 The introduction of prejudicial evidence at a State criminal trial violates the Constitution if it "so infused the trial with unfairness as to deny due process of law." *Estelle v. McGuire,* 502 U.S. 62, ——, 112 S.Ct. 475, 484, 116 L.Ed.2d 385 (1991) (quoting *Lisenba v. California,* 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941)). In evaluating whether the admission of evidence violates the Constitution, a federal habeas court must assess whether the prejudicial impact of the evidence outweighs its probative value so as to rise to the level of a due process violation. *See Lesko v. Owens,* 881 F.2d 44, 51 (3d Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990); *Collins v. Francis,* 728 F.2d 1322, 1336 (11th Cir.1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984). In order for an error to constitute fundamental unfairness, it must "be material in the sense of a crucial, critical, highly significant factor." *Collins,* 728 F.2d at 1336–37. *See also Lesko,* 881 F.2d at 52 (probative value must be "so conspicuously outweighed by its inflammatory content").

 The relevant question in this case is thus whether the admission of evidence of a grenade detonator at Rickman's trial so infected the trial with unfairness as to make the resulting conviction a denial of due pro-

cess. *See Romano v. Oklahoma*, 512 U.S. ——, ——, 114 S.Ct. 2004, 2012, 129 L.Ed.2d 1 (1994). At trial, the State failed to establish that the grenade detonator had any relevance to the killing of Mrs. Groseclose. Moreover, the Court finds the admission of evidence that Rickman owned a grenade detonator to be highly prejudicial because it undoubtedly created the impression that Rickman was dangerous and violent. The Court concludes that the trial court thus denied Rickman due process by allowing the jury to convict him of a capital crime based upon consideration of irrelevant and highly inflammatory evidence.

 Where, as in this case, the constitutional violation is limited to the erroneous admission of particular evidence at trial, the violation is subject to the harmless-error standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as modified by *Brecht v. Abrahamson*, 507 U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See Satterwhite v. Texas*, 486 U.S. 249, 258–59, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988) (applying *Chapman* test to the erroneous admission of a doctor's testimony). Under *Chapman*, a federal constitutional error may be held harmless where the reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828 (adhering to *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), in which inquiry focused on whether there was a reasonable possibility that error contributed to conviction). However, where a State court has previously conducted *Chapman* harmless error review, a federal habeas court must review the error for harmlessness under the standard of *Kotteakos v. United States*, 328. U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), that "the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at ——, 113 S.Ct. at 1722 (citing *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253).

 In the instant case, the Tennessee Supreme Court addressed Rickman's allegation that the admission of evidence about a grenade detonator was prejudicial. *Groseclose*, 615 S.W.2d at 146–47. The Tennessee Supreme Court held that the admission of such evidence did not constitute error and that, even if error had occurred, such error was "at most harmless." *Id.* at 147. Notably, the Tennessee Supreme Court's opinion does not reveal that the court conducted harmless-error analysis under *Chapman*. This Court is therefore the first court to review the error in this case and is required to conduct harmless error analysis under *Chapman* rather than under *Kotteakos*. *See Starr v. Lockhart*, 23 F.3d 1280, 1292 (8th Cir.1994); *Orndorff v. Lockhart*, 998 F.2d 1426, 1430 (8th Cir.1993), *cert. denied*, 511 U.S. ——, ——, 114 S.Ct. 1631, 1633, 128 L.Ed.2d 354, 356 (1994).

 Upon reviewing the error for harmlessness under *Chapman*, the Court finds this to be a rare instance in which the admission of improper evidence is both highly prejudicial and, at the same time, harmless. As the Court has recognized, Rickman's attorney elicited a substantial amount of testimony portraying Rickman as dangerous and violent, including testimony about the objectionable grenade detonator. Accordingly, the grenade detonator evidence was only cumulative of other, similarly inflammatory evidence offered by Rickman's own attorney. The admission of the grenade detonator evidence was harmless beyond a reasonable doubt. *See Chapman*, 386 U.S. at 24, 87 S.Ct. at 828.[16]

## F. *Claim 6: Medication*

 Rickman alleges that he was unconstitutionally administered Meprobamate and Dalmane by the State at critical stages of his trial. The State argues that the Tennessee Court of Criminal Appeals addressed Rickman's claim on post-conviction review, and that the Court of Criminal Appeals' findings that Rickman was able to function normally

---

**16.** Notably, if the Tennessee Supreme Court did conduct *Chapman* harmless error review, the Court nevertheless finds the error harmless under *Kotteakos* because the error did not have a

"substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253. *See also Brecht*, 507 U.S. at ——, 113 S.Ct. at 1722.

at trial are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).

▇▇▇ Medication which is administered to a nonconsenting person "represents a substantial interference with that person's liberty." *Washington v. Harper,* 494 U.S. 210, 229, 110 S.Ct. 1028, 1041, 108 L.Ed.2d 178 (1990). Where a state administers medication to a defendant at trial or during pretrial proceedings, due process requires that the state show that the treatment is medically appropriate and "necessary to accomplish an essential state policy." *Riggins v. Nevada,* 504 U.S. ——, ——, 112 S.Ct. 1810, 1817, 118 L.Ed.2d 479 (1992). *See also Harper,* 494 U.S. at 227, 110 S.Ct. at 1040 (due process requires determination that medication necessary and medically appropriate). Moreover, a state may justify medically appropriate, involuntary treatment with a drug by establishing that it could not obtain an adjudication of a defendant's guilt or innocence "by using less intrusive means." *Id.,* 504 U.S. at ——, 112 S.Ct. at 1815. In *Riggins* the Supreme Court thus held that administering antipsychotic drugs to a defendant at trial was constitutional error where the lower court failed to make findings that the medication was necessary, address the reasonable alternatives to medication, or indicate the existence of safety considerations or other compelling concerns that would justify administering the medication. 504 U.S. at ——, 112 S.Ct. at 1815–16.

▇▇▇ Upon its own initiation, the State of Tennessee decided to administer the drugs Dalmane and Meprobamate to Rickman throughout his trial. Accordingly, the burden was on the State to demonstrate that the administration of such drugs was medically appropriate, and was essential to promote a compelling State interest. *See Riggins,* 504 U.S. at ——, 112 S.Ct. at 1817.

▇▇▇ The Tennessee Court of Criminal Appeals addressed only the question of whether Rickman was competent to stand trial, and not whether Rickman "was unconstitutionally administered medication which affected his competency, demeanor, [or] physical and mental state throughout trial." (Pet'r Second Am.Pet., Doc. No. 128A, at 58.)

Moreover, the findings of the Court of Criminal Appeals do not fully address the question of whether the State discharged its burden of demonstrating that it was medically necessary and proper to medicate Rickman. Accordingly, the State court factfindings are not entitled to a presumption of correctness under 28 U.S.C. § 2254(d)(1), (3), and (6), and this Court is required to make subsidiary findings necessary for proper resolution of this claim. *See Dick v. Scroggy,* 882 F.2d 192, 194 (6th Cir.1989); *Bragan,* 791 F.Supp. at 718.

The proof in this case is that even though Rickman and Groseclose never requested any assistance in sleeping, jail officials took them to see Dr. Wender, a psychiatrist, prior to trial. (P.C.Tr. 233.) Dr. Wender informed Rickman and Groseclose that he was going to give them Dalmane, a sedative. (*Id.*) On February 17, 1978, the day before Rickman and Groseclose's joint trial commenced, the State began administering Dalmane to Rickman and Groseclose, each at a dosage of 30 milligrams per day. (*Id.* at 183, 186, 308.) The State began administering the depressant Meprobamate to Groseclose on February 22, a few days into the trial. (*Id.* at 183.) The State began administering Meprobamate to Rickman on the following day. (*Id.* at 186; Pet'r P.C.Ex. 6.) Both Rickman and Groseclose received the maximum allowable dosage of 1600 milligrams per day. (P.C.Tr. 183, 186, 301.) Rickman and Groseclose remained on the same dosages of Dalmane and Meprobamate throughout the trial. On March 7, a few days after the trial ended, the State began reducing the Meprobamate dosage given to both Rickman and Groseclose to 1200 milligrams each per day. (*Id.* at 184, 187; Pet'r P.C.Ex. 6.)

▇▇▇ Where criminal defendants are thus administered drugs which cause drowsiness and may inhibit their ability to follow the proceedings, due process requires a showing that such medication is necessary to accomplish an essential state policy. *Riggins,* 504 U.S. at ——, 112 S.Ct. at 1817. Although it is evident that the amount of medication administered to Rickman was within acceptable limits, the Court is skeptical that any medical necessity compelled the

State to administer the medication.[17] The Court finds that the State has failed to satisfy its burden either at trial or post-conviction review, or in these federal habeas proceedings, to show that administering mind-dulling drugs to Rickman was medically necessary and justified by a compelling State interest. Moreover, because efforts to prove or disprove actual prejudice from the record before the Court would be "futile," *Riggins,* 504 U.S. at ——, 112 S.Ct. at 1816, and the precise consequences of compelling Rickman to take mind-numbing drugs "cannot be shown from a trial transcript," *id.,* the Court is foreclosed from conducting harmless error review. *See id.*

### G. *Claim 7: Shackling*

■ On Rickman's direct appeal, the Tennessee Supreme Court simultaneously addressed Rickman's shackling claim and Rickman's jury contamination claim[18], concluding:

These incidents are referred to very briefly in the transcript; none are documented by affidavits; and we are of the opinion that the trial judge committed no reversible error in respect to any of the matters complained of by appellants in the impaneling of the jurors.

*Groseclose,* 615 S.W.2d at 148. The State argues that the Tennessee Supreme Court thus rejected Rickman's claim on the basis of a state procedural rule, described in *State v. Fowler,* 213 Tenn. 239, 373 S.W.2d 460 (1963), requiring that such a claim be supported by affidavit.

The Court rejects the State's argument for two reasons. First, the Court finds that the Tennessee Supreme Court did not make a clear and express statement that the judgment rests on a state procedural bar. Indeed, the opinion plainly indicates that the Tennessee Supreme Court addressed the claim on the merits and rejected it because the evidence did not require reversal. Second, the Court finds that *Fowler* does not require that affidavits be submitted for consideration of an improper shackling claim. Instead, affidavits are not required under *Fowler* if the reviewing court can resolve the claim upon review of the record. *See Fowler,* 373 S.W.2d at 464. The Court concludes that Rickman violated no firmly established state procedural rule, and that his claim is not procedurally defaulted. *See Warner,* 975 F.2d at 1213.

■ Turning to the merits of Rickman's claim, it is well-settled that a criminal defendant is entitled to a fair and impartial trial, including, as a general rule, the physical indicia of innocence. *Kennedy v. Cardwell,* 487 F.2d 101, 104 (6th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). During trial, a defendant should not be shackled before a jury unless extraordinary circumstances are present, such as when physical restraints are required to prevent the defendant from escaping, protect those present in the courtroom, or maintain order during trial. *Id.* at 111; *Woodards v. Cardwell,* 430 F.2d 978, 982 (6th Cir.1970), *cert. denied,* 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971). Precipitously shackling a defendant when less drastic security measures will suffice is an abuse of discretion. *Kennedy,* 487 F.2d at 111. However, where a defendant is seen in shackles by one or more jurors for only a short period of time, either in the courtroom or somewhere in the courthouse, the constitutional inquiry focuses on the degree of prejudice resulting to the defendant under the circumstances. *Id.* at 109–110. The burden of proof is on the Rickman to show that his constitutional rights were violated by being handcuffed. *Id.* at 111–12.

■ The record establishes that Rickman was handcuffed at one point during the trial for a short period of time. Specifically, after being seen by a doctor, Rickman was returned to court in handcuffs during a recess in the testimony of his girlfriend, Pamela

---

17. Significantly, Rickman and Groseclose were given exactly the same dosages of two different depressant drugs at an almost identical time, commencing one day prior to trial, and then had their dosages reduced on the same day, immediately after the trial ended.

18. *See* Section II(H), *infra,* for the Court's discussion of Rickman's jury contamination claim.

Baker Lindsey. (Trial Tr. 798–808.) After Lindsey began testifying for a matter of time which is reflected in ten pages of the trial transcript, *see* Trial Tr. 798–808, Rickman released an "audible groan" which was recorded in the transcript by the court reporter. (*Id.* at 808.) At that point, Rickman's attorney stated, "Judge, my client's sitting over there with handcuffs on." (*Id.*) Judge Lafferty responded that he had not known that Rickman had been handcuffed, and ordered the handcuffs removed. (*Id.* at 809.) The bailiff removed the handcuffs, and Rickman's attorney continued cross-examining Lindsey. (*Id.*)

Based on the record before the Court, it appears that Rickman was handcuffed inadvertently and without justification. Although Rickman was handcuffed for only a brief period, the fact that he was handcuffed must have been obvious to the jury when Rickman suddenly groaned, thereby disrupting testimony, and the court and Rickman's attorney then engaged in the exchange which resulted in the removal of the handcuffs. Nevertheless, this Court finds that the error in briefly displaying Rickman to the jury in handcuffs was not so prejudicial as to rise to the level of a constitutional violation. When the situation was brought to the attention of the court, it was immediately addressed and remedied. As well, the Court notes that prospective jurors had been questioned on the use of handcuffs and the presumption of innocence. (*Voir dire* Tr. 67–68, 395, 1165–66.) The Court concludes that Rickman has not sustained the burden of proof to establish that his constitutional rights were violated by the shackling.

### H. *Claim 8: Jury Contamination*

As the Court has found with respect to Rickman's shackling claim, Rickman's jury contamination claim is not barred for failure to follow a state procedural rule requiring that a juror misconduct claim be supported by affidavits or evidence embodied in the transcript. *See Fowler,* 373 S.W.2d at 464. Because Rickman violated no firmly estab-

lished state procedural rule, *see Warner,* 975 F.2d at 1213, this claim is now properly before the Court.[19]

A criminal defendant has a constitutional right to a fair trial before an impartial trier of fact. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). *See also Morgan v. Illinois,* 504 U.S. ——, ——, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992) (due process demands that jury stand impartial and indifferent to extent commanded by Sixth Amendment). The Constitution does not require that prospective jurors "be totally ignorant of the facts and issues involved." A juror who has a preconceived notion about a defendant's guilt or innocence is nevertheless presumed to be impartial if the juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643.

Where a defendant alleges that a trial has been contaminated by unauthorized contact with a juror, a hearing must be held "in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982). *See also United States v. Zelinka,* 862 F.2d 92, 95–96 (6th Cir.1988) (defendant bears burden of proving actual juror bias). The hearing enables the trial court to determine the circumstances of the alleged contact, the effect upon any juror, and whether or not such contact was prejudicial. *See Remmer v. United States,* 347 U.S. 227, 229–30, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), *cited with approval in Zelinka,* 862 F.2d at 94–95.

The question of the impartiality of jurors is a mixed question of law and fact which is subject to a *de novo* review by this Court. *See Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643 (mixed question of law and fact requires federal court to independently evaluate *voir dire* testimony). Accordingly, the State court factual findings on this claim are not entitled to a presumption of correctness un-

---

**19.** *See* Section II(G), *supra,* for a discussion of procedural default with respect to Rickman's shackling claim.

der 28 U.S.C. § 2254(d). *See Levine,* 986 F.2d at 1514.

■ The transcript reveals that, while several prospective jurors waited in the jury room to be called for *voir dire,* they overheard statements about the case made by individuals who were returning to the jury room after they had been questioned on *voir dire.* Only one prospective juror actually overheard comments regarding Rickman's guilt or innocence, and she stated under oath that the comments she overheard would not affect her verdict and that she could be fair and impartial. (*Voir dire* Tr. 1054–55.) The other prospective jurors who overheard comments reported that the comments they overheard were related only to whether the individuals speaking "had been over there" for *voir dire* and whether they had been excused from the jury. (*Id.* at 1051–58.) Notably, the one prospective juror who overheard remarks about Rickman's guilt or innocence ultimately did not serve on the jury.

The Court finds that Rickman has failed to demonstrate any bias resulting from the unauthorized contact with prospective jurors. *See Smith,* 455 U.S. at 215, 102 S.Ct. at 945; *Zelinka,* 862 F.2d at 95–96. Accordingly, the trial court properly denied Rickman's request to strike for cause all of the prospective jurors who overheard comments in the jury room.

I. *Claim 9: Ineffective Assistance Of Counsel Due To Failure To Properly Raise Issues Alleged In Habeas Petition*

Rickman asserts that any alleged failure to properly raise any of the issues in his habeas petition at an earlier point in the proceeding resulted from the ineffective assistance of counsel. To the extent that Rickman's claim addresses objections which counsel failed to make at the guilt phase of trial, the Court has already found that Livingston rendered constitutionally ineffective assistance of counsel at the guilt phase of trial.[20] However, to the extent that Rickman is alleging ineffective assistance of counsel on appeal, the

Court finds that Rickman has not presented sufficient proof regarding Livingston's involvement on appeal. The Court therefore dismisses Rickman's claim.

J. *Claim 10: Cumulative errors*

■ The Sixth Circuit has recognized that errors which individually might not rise to the level of a constitutional violation may, when considered cumulatively, render a trial fundamentally unfair. *See Lundy v. Campbell,* 888 F.2d 467, 472–73 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990); *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir.1983), *cert. denied,* 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983). The Court has found that Rickman's trial was tainted by several constitutional errors. He was convicted on the basis of the false and misleading testimony of Barton Wayne Mount; received no meaningful defense from counsel; and was drugged throughout the trial. The jury then based its verdict on a "reasonable doubt" instruction which misstated the State's burden of proof. In addition, the Court found that the trial court improperly admitted evidence of a grenade detonator, and that Rickman was improperly shackled in front of the jury.

The Court concludes that even if any one of the errors found in this case does not individually require that Rickman be given a new trial, the cumulative effect of the errors violates due process and mandates issuance of the writ.

III. CONCLUSION

For the above-stated reasons, the Court finds that Rickman was denied constitutionally effective assistance of counsel at the guilt phase of trial (Claim 1); was denied due process and a fair trial because the State presented the false and misleading testimony of Barton Wayne Mount and withheld material evidence concerning such false testimony (Claim 2); was convicted on the basis of an unconstitutional "reasonable doubt" jury instruction (Claim 3); was unconstitutionally

---

**20.** *See* Section II(A), *supra,* for the discussion of Rickman's ineffective assistance of trial counsel claim.

administered medication which affected his demeanor and ability to assist with his defense at trial (Claim 6); and was denied due process at the guilt phase of trial due to the cumulative effect of these errors (Claim 10).

Accordingly, the Court hereby vacates Rickman's conviction for first-degree murder. Furthermore, the writ of habeas corpus shall issue, unless within 120 days from the entry of this order the State affords Rickman a new trial for first-degree murder.

An Order consistent with the findings herein is filed contemporaneously.